**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-0461-WJM-NYW

RESIDENCES AT OLDE TOWN SQUARE ASSOCIATION,

     Plaintiff,

v.

TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA,

     Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND ORDERING
PLAINTIFF TO SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT ENTER
ON ADDITIONAL THEORIES**

---

This is an insurance coverage dispute arising out of hail damage suffered by a condominium complex in Arvada, Colorado, on May 8, 2017. Plaintiff Residences at Olde Town Square Association ("Plaintiff") is the homeowners' association that manages the complex. Defendant Travelers Casualty Insurance Company of America ("Defendant") was Plaintiff's property and casualty insurer at the relevant time. Plaintiff's complaint pleads two causes of action: (1) breach of contract and (2) unreasonable delay or denial of insurance benefits in violation of Colorado Revised Statutes §§ 10-4-1115 and -1116. (ECF No. 1 at 12–15.)

Currently before the Court is Defendant's Motion for Partial Summary Judgment (ECF No. 66) and Plaintiff's Motion for Summary Judgment (ECF No. 67). Although not evident from the caption, Plaintiff's motion, like Defendant's, seeks only partial summary judgment. Defendant asks that the Court enter summary judgment against Plaintiff's

unreasonable delay/denial claim. (ECF No. 66 at 1–2.) Plaintiff's motion asks for summary judgment that one specific action by Defendant (among many other alleged wrongs) was both a breach of contract and an unreasonable denial of insurance benefits. (ECF No. 67 at 1–2.)

For the reasons explained below, Defendant's motion is granted in full and Plaintiff's motion is denied in full. That leaves only the breach of contract claim for trial. But it appears to the Court that some of Plaintiff's contract theories would have failed as a matter of law if Defendant had moved against them. Per Federal Rule of Civil Procedure 56(f), the Court will order Plaintiff to address why summary judgment should not enter on certain contract theories raised in Plaintiff's motion but not moved against in Defendant's motion.

This disposition also moots the parties' pending Rule 702 motions attacking each other's claims practices experts (ECF Nos. 95 & 96) because those experts are relevant only to the unreasonable delay/denial claims.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.[1]

### A. The Inception of the Policy

In 2015, Plaintiff went to Buckner and Company of Colorado, LLC ("Buckner"), to obtain a new property and casualty policy for the condominium complex. (ECF No. 67 at 5, ¶ 9; ECF No. 67-6 at 4; ECF No. 69 at 8, ¶ 2.)[2] The Buckner employee who assisted Plaintiff was Dustin Thome. (*Id.*)

Mr. Thome applied to Defendant on Plaintiff's behalf for an insurance limit of $7 million, which he judged to be the appropriate insurable value according to various

---

[1] Both sides have, in many instances, either evaded or ignored WJM Revised Practice Standard III.E.4's requirements for responses to assertions of material of fact. For instance, Plaintiff sometimes labels Defendant's factual assertions "problematic" (*see, e.g.*, ECF No. 71 at 8), but fails to admit or deny them. Plaintiff also objects—without explanation—to certain assertions as inadmissible "under F.R.C.P. 56" (*id.* at 10, 12), even though the standard is whether a fact can "be presented in a form that would be admissible at trial," Fed. R. Civ. P. 56(c)(2). And Defendant frequently declares that it disputes Plaintiff's assertions when it does not actually dispute them, but simply wants to provide additional context. (*See, e.g.*, ECF No. 83 at 5, ¶¶ 27–28.) The recitation of facts below arises from the Court's careful consideration of whether a nominally disputed fact is properly, substantively supported by the cited evidence. Unexplained objections or disputes are deemed forfeited and the Court has ignored them.

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, especially in exhibits.

inputs he entered into a web-based calculation tool licensed by Defendant and made available to agencies such as Buckner.  (ECF No. 67 at 5, ¶¶ 9–12; ECF No. 69 at 4, ¶ 11; *id.* at 8, ¶ 2.)  The parties dispute just how much Mr. Thome was responsible for entering data into Defendant's tool.  (ECF No. 84 at 11, row 2, col. 2.)  Regardless, Defendant's underwriting system "automatically evaluated the requested $7 million limit against the information input by [Mr. Thome] concerning the property including the total square footage and type of construction."  (*Id.* ¶ 3.)

The requested limit was a "blanket limit," meaning, in this context, that it covered all buildings under a single insurance limit.  (*Id.* ¶¶ 4–5; ECF No. 66-1 at 4.)  Defendant's underwriting guidelines require that "a blanket limit must be within 80 to 150 percent of the property's estimated value as determined by the information input by the agent."  (ECF No. 69 at 8, ¶ 4.)  "Based upon the construction information input [by Thome] in 2015, the requested blanket limit of $7 million was accepted as being between 80 and 150 [percent] of the property's value and no independent valuation was performed."  (*Id.* ¶ 5.)  The policy therefore issued in 2015 with a $7 million blanket limit.  (*Id.* ¶ 7.)  This limit automatically increased by 3% in the 2016 renewal policy, and again by 3% in the 2017 renewal policy (*id.*), which is the policy at issue in this lawsuit ("Policy") (ECF No. 66 at 2, ¶¶ 1, 3).

**B.  The Policy**

The Policy's declarations page reads as follows concerning property and casualty coverage:

PREMISES LOCATION NO.:  001       BUILDING NO.:  ALL

|  |  | LIMIT OF INSURANCE | VALUATION | COINSURANCE | INFLATION GUARD |
|---|---|---|---|---|---|
| COVERAGE |  |  |  |  |  |
| BUILDING | $ | 7,426,300 Blanket Limit | RC* | N/A | 0.0% |
| *Replacement Cost |  |  |  |  |  |

(ECF No. 67-1 at 4.)  The $7,426,300 blanket limit is the result of adding 3% to the 2015 policy, and then again to the 2016 policy.

As shown, the valuation column specifies "Replacement Cost."  For purposes of blanket insurance, the Policy defines Replacement Cost as "[t]he amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured."  (ECF No. 83-3 at 3.)

The Policy has a "Windstorm or Hail Percentage Deductible" endorsement ("Deductible Endorsement") that, as its name suggests, governs the deductible for a wind or hail damage claim.  (*See* ECF No. 66-1 at 4.)  The Endorsement establishes the deductible as 2% of

> the value(s) of the property that has sustained loss or damage.  The value(s) to be used are those shown in the Statement of Values on file with us.  If there is no Statement of Values on file with us, then the value(s) to be used will be the value of the property at the time of loss.

(*Id.* at 4–5.)

The Policy term was one year, commencing on February 16, 2017.  (ECF No. 67-1 at 2.)

## C.     The Claim

On May 8, 2017—not quite three months from the commencement of the Policy

term—Plaintiff's properties suffered damage in a hail storm. (ECF No. 66 at 3, ¶ 8.) Plaintiff made a claim on the Policy on July 19, 2017. (*Id.* at 4, ¶ 12.) On August 8, 2017, Defendant retained Andrew Condie, to assist Defendant in assessing damage to the property and needed repairs. (*Id.* ¶ 14.) Mr. Condie and certain of Plaintiff's representatives inspected the property on August 10, 2017, and "determined that repairs were necessary to the buildings' roofs, gutters, stucco and windows." (*Id.* ¶ 15.)

      1.    <u>The Property Valuation, Repair Estimate & First Payment</u>

Before Defendant could issue any payment, it needed to calculate the deductible for wind/hail damage. No Statement of Values was on file with Defendant. (*Id.* at 6, ¶ 24.) The Deductible Endorsement thus specified that the deductible would be calculated against "the value of the property at the time of loss." (ECF No. 66-1 at 5.) Defendant calculated this value through a software tool known as "Commercial Express." (ECF No. 71 at 18, ¶ 19.)

Commercial Express produces a value known as "reconstruction cost." (*Id.* at 19, ¶ 20.) According to Defendant's expert, Guy Kopperud of CoreLogic (the company that develops Commercial Express), "reconstruction cost" is a term used within CoreLogic to denote the true cost of rebuilding an existing structure after a covered loss, when time frames are compressed, economies of scale are usually unavailable, the contractor must work around existing structures, and so forth. (ECF No. 71-16 at 5, 7; ECF No. 69-9 at 7.) Reconstruction cost is distinct from "replacement cost, new" (also a term internal to CoreLogic), which is "typically used for appraisal and assessor purposes to establish a value on a property where those precautions [*e.g.*, working around existing structures] aren't necessary." (ECF No. 71-16 at 5; *see also id.* at 7; ECF No. 69-9 at 6–7.)

An employee of Defendant made a reconstruction cost calculation for Plaintiff's property on August 11, 2017, the day after Mr. Condie's inspection. (ECF No. 67 at 6, ¶ 22.) The calculation came out to $9,569,132. (*Id.*) However, the employee's supervisor discovered an error in the inputs. (*Id.* ¶ 23; ECF No. 68-2 at 4.) After correcting the error, the calculation came out to $10,353,567. (ECF No. 67 at 7, ¶ 24; ECF No. 69 at 6, ¶ 24.) On August 14, 2017, Defendant communicated this property valuation and the resulting 2% deductible to Plaintiff. (ECF No. 66 at 6, ¶¶ 27–28.)[3] On August 17, 2017, Defendant issued to Plaintiff a payment of $478,086.09, which was Defendant's estimate of the repair cost minus the deductible. (*Id.* at 4, ¶ 16.)

2.  Plaintiff's Uncommunicated Concerns Regarding the Property Valuation

Around this same time, Plaintiff consulted with its attorney about Defendant's overall valuation of the property at $10,353,567, given the effect that value had on the deductible. (*Id.* at 6–7, ¶¶ 29–32.) Plaintiff's attorney advised Plaintiff on September 18, 2017 that "[g]ood legal arguments can be made that the amount of the value should be the amount in the declarations page." (*Id.* ¶ 33; ECF No. 66-13 at 4–5.) In other words, the attorney opined that the Policy's $7,426,300 blanket limit should be deemed the property value as well, leading to a lower 2% deductible.

At some point—Plaintiff does not specify when—a representative of Plaintiff asked Mr. Thome (of Buckner) about Defendant's property valuation. (ECF No. 67 at 7, ¶ 30.) Mr. Thome expressed surprise when he learned that Defendant had valued the property higher than the blanket limit. (*Id.* ¶ 29.)

---

[3] Two percent of $10,353,567 is $207,071.34. However, due to a Policy feature (not relevant here) called "Total Applied Deductible," Defendant claimed a slightly smaller deductible, *i.e.*, $206,673.38. (*See* ECF No. 66-5 at 9.)

Prior to filing this lawsuit in February 2018 (*see* Part II.C.5, below), Plaintiff did not express any concerns about Defendant's valuation directly to Defendant. (ECF No. 66 at 7, ¶ 34.)[4]

### 3. The Revised Repair Estimate & Second Payment

On September 13, 2017, Plaintiff's contractor gave Defendant a higher overall repair-cost estimate, seeking $735,467.88. (*Id.* at 5, ¶ 17.) For approximately the next month, Defendant and its consultant, Mr. Condie, worked with Plaintiff's contractor to attempt to resolve their differences. (*Id.* ¶ 18.)

One of the main disputes was whether replacement windows should be "finned" or not. (ECF No. 71 at 13, ¶ 1.) Plaintiff believes that un-finned windows are inferior from a waterproofing perspective. (*Id.*) Another dispute was underlayment, more specifically, a membrane beneath the roof shingles to protect against water and ice. (*Id.* at 20, ¶ 34.) No party asserts whether the roofs to be replaced had an underlayment. However, Plaintiff maintained to Mr. Condie that Jefferson County (which encompasses Arvada) requires such underlayment (*id.* ¶ 35), while Mr. Condie told Plaintiff that he "double checked and verified that the city of Arvada does not require the use of Ice and Water Shield, surprisingly" (ECF No. 71-17).[5] Plaintiff has placed into the record a City of Arvada document stating that underlayment is "not required" but then referring the reader to an "attached letter" stating that "if the manufacturer [of the roofing material] requires additional measures [including underlayment] then the City of Arvada will

---

[4] Around the turn of 2017 into 2018, someone at Buckner (Mr. Thome or "one of [his] account managers") discussed the increased valuation with Defendant in the context of a proposed 2018 renewal policy, but no one at Buckner told Defendant that the valuation was inaccurate or troubling to Plaintiff. (*See* ECF No. 67 at 6, ¶ 18; ECF No. 67-6 at 7.)

[5] Defendant asserts that the original estimate included underlayment "in certain areas" (ECF No. 83 at 6, ¶ 34), but Defendant cites nothing to support this.

require it." (ECF No. 71-18 at 1, 3.) Plaintiff has put nothing in the record showing that Defendant understood this nuance at the time, or that underlayment was a manufacturer requirement for the roofing material in question.[6]

On October 24, 2017, Mr. Condie sent an e-mail to Defendant describing "the number of issues that remain" with Plaintiff's contractor's estimate and opining that "it seems more effective to get a second opinion rather than continue to go back and forth on [those] issues." (ECF No. 66-7 at 2.) Defendant soon informed Plaintiff that it was seeking an estimate from an another contractor, and Defendant in fact reinspected the property on November 2, 2017 with that contractor, Dynamic Roofing and Construction ("Dynamic"). (ECF No. 66 at 5, ¶¶ 20–21.)

Dynamic transmitted its repair-cost estimate to Mr. Condie on November 7, 2017. (*Id.* ¶ 22; ECF No. 66-9 at 2.) Dynamic's estimate was $542,184.86. (*Id.* at 30.) The next day, Dynamic solicited Plaintiff to perform the repairs. (ECF No. 71 at 15, ¶ 5(h)–(i).) Plaintiff says it did not want to use Dynamic because Plaintiff was already comfortable with the contractor it had selected and Plaintiff did not trust any contractor that Defendant was "promoting." (ECF No. 71-9 ¶ 5.) Plaintiff alleges that Defendant uses Dynamic "to come in with low estimates in an attempt to force the policyholder to accept a lesser amount on the claim." (ECF No. 71 at 16, ¶ 6.)

On November 27, 2017, Mr. Condie sent Defendant a revised repair-cost estimate of $538,747.04. (ECF No. 66 at 5, ¶ 23.) This revised estimate included,

---

[6] Plaintiff asserts that a different contractor named Dynamic (see below) "included [underlayment] in [its] estimate because it is a manufacturer requirement." (ECF No. 71 at 21, ¶ 38.) The deposition testimony Plaintiff cites in support of this assertion does not say that underlayment is a manufacturer requirement; it says that "starter course" shingles are a manufacturer requirement. (ECF No. 71-11 at 9.)

among other things, a "substantially" increased payout for finned windows. (ECF No. 71 at 13, ¶ 1(c).)

Mr. Condie's revised estimate relied on a "price list" (apparently a list of what various materials cost) that was current as of May 2017. (ECF No. 71-2 at 6.) This was at Defendant's direction, specifically, Defendant asked Mr. Condie to estimate the cost of repairs as of the date of loss. (ECF No. 71 at 19, ¶ 27.) Prices had actually risen by about 2.6% by November (*id.* at 20, ¶ 30), although nothing in the record shows whether Defendant or Mr. Condie knew that.

The next day (November 28, 2017), Defendant sent to Plaintiff a letter with Mr. Condie's new estimate. (ECF No. 66-10 at 2.) The day after that, Defendant sent a check to Plaintiff for an additional $92,276.59, due to the revised estimate. (ECF No. 66 at 5, ¶ 23.)

4.    The Third Repair Estimate

In December 2017, Dynamic generated an even higher estimate: $571,243.22. (ECF No. 83-2 at 21.) Mr. Jed Sybrowsky (Dynamic's owner, who handled this claim) stated at his deposition in this lawsuit, taken on September 7, 2018, that his "recollection" was that Defendant verbally agreed to pay Dynamic up to this new amount if Dynamic performed the repairs for Plaintiff. (ECF No. 71-11 at 8.) But he also stated in an e-mail to Plaintiff's counsel three days later, "I show no record that this [higher estimate] was actually sent to [Defendant] or [Mr. Condie], so my guess is we verbally agreed to this price. This was a long time ago and I have worked on hundreds of projects since so things aren't 100% clear on this." (ECF No. 83-2 at 2.) Defendant's internal claim notes show two phone calls between Defendant and Dynamic in December 2017. (ECF No. 71 at 16, ¶ 8.)

5.     <u>Final Interactions Before Plaintiff Files Suit</u>

On January 8, 2018, Defendant left a voice message with Plaintiff about the status of the claim.  (ECF No. 66 at 7, ¶ 35; ECF No. 66-5 at 18.)  Plaintiff and Defendant finally spoke on January 25, 2018.  (ECF No. 66 at 7, ¶ 36.)  Plaintiff told Defendant that Plaintiff's new board of directors "was evaluating the claim."  (*Id.*)  By this time, Plaintiff had already decided to file a lawsuit about the property value calculation and resulting deductible, although Defendant did not know that.  (*Id.* ¶ 37; ECF No. 71 at 12, ¶ 37.)

Plaintiff and Defendant spoke again on February 23, 2018.  (ECF No. 66 at 8, ¶ 38.)  Plaintiff's property manager asked Defendant's representative "a series of questions regarding [Defendant's] November 27, 2017 estimate."  (*Id.*)  Defendant's representative stated (apparently in addition to answering Plaintiff's questions) that Dynamic was willing to perform the repairs for the amount of Defendant's estimate, and so Defendant considered the claim closed.  (ECF No. 71 at 16, ¶ 9.)  Plaintiff filed this lawsuit later that same day.  (ECF No. 1.)

### III.  ANALYSIS

For its breach of contract claim, Plaintiff seeks the difference between the deductible as calculated by Defendant and what Plaintiff believes to be the maximum possible deductible (described below).  (ECF No. 66 at 8, ¶ 39.)  Plaintiff also seeks the difference between its contractor's repair estimate and the amounts Defendant has already paid.  (*Id.*)

For its unreasonable delay/denial claim, Plaintiff seeks double damages on all of the amounts it believes it is owed under its breach of contract claim, plus double damages on the approximately $92,000 payment Defendant sent to Plaintiff in

November 2017 (under the theory that Defendant should have recognized its duty to add at least this amount to its August 2017 payment, and so the $92,000 was unreasonably delayed).  (*Id.*)

Plaintiff's summary judgment motion seeks judgment as a matter of law only as to the portion of its contract and unreasonable delay/denial claims relating to calculation of the deductible.  Defendant's summary judgment motion seeks judgment as a matter of law on all of Plaintiff's unreasonable delay/denial theories, but not on any contract theory.  Thus, the parties' motions do not overlap, save for Plaintiff's unreasonable delay/denial claim as it relates to the deductible.

The Court will first address Plaintiff's contract theory regarding the deductible. The Court will then address the related unreasonable delay/denial theory.  The Court will conclude by addressing Plaintiff's unreasonable delay/denial theories that have no connection to the deductible.

## A.    Disputes Regarding Valuation & Deductible

Plaintiff seeks summary judgment that Defendant breached the Policy through the way it calculated the property's value, in turn leading to a higher deductible.  (ECF No. 67 at 9–12.)  Plaintiff says that the deductible must be 2% of the $7,426,300 blanket limit stated on the Policy's declarations page, *i.e.*, $148,526.  But, Plaintiff continues, Defendant withheld 2% of $10,353,567, or $207,071.34.[7]  Thus, Plaintiff seeks summary judgment that Defendant breached the Policy by failing to pay an additional $58,545.34 (the difference between Defendant's and Plaintiff's respective deductible calculations), and that this failure was an unreasonable denial of insurance benefits as a

---

[7] It appears Defendant withheld a slightly smaller amount than this.  (*See* n.3, above.) The discrepancy is immaterial for present purposes.

matter of law.  (*Id.* at 2, 12–13.)

Plaintiff asserts several contract doctrines to support its claim that the deductible must be calculated as 2% of the blanket coverage limit.  The Court will address them serially.

1.  <u>Ambiguity</u>

Plaintiff argues that the word "value" in the Policy is ambiguous, and that the ambiguity should be construed in Plaintiff's favor.  (*Id.* at 9–10.)  *Cf. State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 390 (Colo. 1997) ("Once an ambiguity in the policy language is found, it is construed against the insurer who drafted the policy and in favor of the insured.") ("*Stein*").  Plaintiff refers to the use of the word "value" in the Deductible Endorsement when it says the deductible will be 2% of "the value of the property at the time of loss," assuming no Statement of Values is on file.  (ECF No. 66-1 at 4–5.)  Plaintiff notes that "value" is undefined, and argues that it is therefore ambiguous.  (ECF No. 67 at 9.)  "The term 'value' could be replacement value, reconstruction value or fair market value.  It could be whatever value is calculated by a software program."  (*Id.* at 10.)

Defendant agrees that "the Policy does not define the term 'value.'"  (ECF No. 69 at 3, ¶ 4.)  But that does not mean its meaning is unclear or ambiguous.  (*See* ECF No. 83 at 5, ¶¶ 21, 26.)  Again, the relevant portion of the declarations page looks like this:

BUSINESSOWNERS PROPERTY COVERAGE

| | | LIMIT OF | | | INFLATION |
| PREMISES LOCATION NO.: 001 | | BUILDING NO.: ALL | | | |
| COVERAGE | | INSURANCE | VALUATION | COINSURANCE | GUARD |
| BUILDING | $ | 7,426,300 Blanket Limit | RC* | N/A | 0.0% |
| *Replacement Cost | | | | | |

(ECF No. 67-1 at 4.)  Under the heading "VALUATION" is "RC*", which connects to the

footnote specifying "Replacement Cost."  Thus, replacement cost is the relevant value.  Plaintiff agrees with at least this much.  (*See* ECF No. 84 at 15 ("The endorsement clearly states that there is coverage for replacement cost and the * between one column and the next reinforces this belief.").)

Replacement cost means "[t]he amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured."  (ECF No. 83-3 at 3.)  Thus, "value," although not defined *per se*, is not ambiguous.

Plaintiff argues that "[t]he policy as a whole gave a clear impression that the value of the property was considered to be approximately $7.4 million.  The declaration section lists the replacement cost and seemingly sets forth a value."  (ECF No. 67 at 12.)  Plaintiff never explains what portions of the Policy "as a whole" inform this argument beyond the declarations page.  As for the declarations page, reproduced above, the figure of "approximately $7.4 million" (*i.e.*, $7,426,300) falls under the heading "LIMIT OF INSURANCE" and is explicitly qualified as a "Blanket Limit."  Neither the declarations page nor the Policy as a whole claims that $7,426,300 is *the replacement cost*.

Nor does the declarations page create an ambiguity.  "A policy provision is ambiguous if it is reasonably susceptible on its face to more than one interpretation" after "evaluat[ing] the policy as a whole and constru[ing] the language in harmony with the plain and generally accepted meaning of the words employed."  *Stein*, 940 P.2d at 387.  The declarations page is not reasonably susceptible to an interpretation that

"LIMIT OF INSURANCE" establishes the predetermined replacement cost value. This is so for at least four reasons.

First, as noted, "replacement cost" is a defined term. It would be superfluous to define "replacement cost" if the Policy predetermined a specific dollar amount. *See Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009) ("We choose a construction of the contract that harmonizes provisions instead of rendering them superfluous.").

Second, the Deductible Endorsement says that Defendant will first look for a "Statement of Values on file with us." (ECF No. 66-1 at 4.) It does not say that Defendant will first look at the declarations page generally, or the insurance limits specifically.[8]

Third, the Deductible Endorsement says that if Defendant has no Statement of Values on file, the value of the property is "the value of the property at the time of loss." (*Id.* at 4–5.) One cannot reasonably interpret this language to refer to a value that has been predetermined before any loss.

Fourth, the Deductible Endorsement gives an example of how Defendant applies the deductible, showing that in a multi-building situation (as here), value is calculated, and the deductible applied, building by building. (*Id.* at 5.) But, as Defendant points out, Plaintiff's theory requires that "a deduc[t]ible based upon the entire amount of the

---

[8] Plaintiff nowhere argues that the declarations page somehow qualifies as a "Statement of Values" as well. Plaintiff instead argues that that the Policy's failure to "state whether a schedule of values is available creates a question and could indicate that the schedule is set forth in the declarations." (ECF No. 67 at 10.) Plaintiff is simply straining to find ambiguity. Plaintiff nowhere explains how the lack of a statement about *whether* a statement of values exists reasonably leads to the inference that the values are instead to be found on the declarations page.

blanket limit would apply regardless of whether a single garage was damaged or the entire property was damaged." (ECF No. 69 at 14.) Plaintiff fails to respond to this argument (*see* ECF No. 84), probably because its logic is hard to escape. Not only is Plaintiff's theory contrary to the Deductible Endorsement's example, but an insured would surely cry foul if the insurer insisted that the deductible always equals 2% of the blanket limit and therefore a claim arising from, say, a single building, must rise to a cost higher than the *property-wide deductible* before benefits are payable.[9]

In sum, construing the Policy as a whole, the declarations page is not reasonably susceptible to interpretation as establishing a predetermined replacement cost value, against which the 2% deductible will be applied. Plaintiff is not entitled to summary judgment on this theory.

    2.    <u>Duty to Make Limiting Conditions Explicit, and Duty to Inform About Reductions in Coverage</u>

Plaintiff emphasizes that "insurers must 'clearly and adequately convey coverage-limiting provisions to insureds.'" (ECF No. 67 at 11 (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1048 (Colo. 2011)).) In the same vein, Plaintiff argues that Defendant's property valuation was an unlawful reduction in coverage without notice. (ECF No. 67 at 11–12.) This argument relies on Colorado Revised Statute § 10-4-110.5(1), which reads in relevant part,

> No insurer shall increase the premium unilaterally or decrease the coverage benefits on renewal of a policy of

---

[9] Interestingly, the Deductible Endorsement example to which Defendant points in support of this argument begins with the premise, "The sum of the values of Building #1 ($500,000), Building #2 ($500,000) and Building #3 ($1,000,000) *as shown in the Declarations* is $2,000,000." (ECF No. 66-1 at 5 (emphasis added).) This suggests that the declarations page sometimes sets forth the value of the individual buildings. But Plaintiff makes no argument in this regard, so the Court will ignore it. In addition, the declarations page at issue here does not contain a building-by-building schedule of values.

> insurance that provides coverages on commercial exposures
> . . . unless the insurer mails by first-class mail to the named
> insured, at the last address shown in the insurer's records, at
> least forty-five days in advance a notice, accompanied by
> the reasons therefor, stating the renewal terms and the
> amount of premium due.

Plaintiff's theory is that it and Buckner (*i.e.*, Mr. Thome) "both expected there would be a 2% deductible based on $7.4 million." (ECF No. 67 at 12.) Plaintiff argues that Defendant's method of valuing the property is either an uncommunicated coverage-limiting provision or an uncommunicated after-the-fact reduction in coverage. (*Id.* at 11–12.)

Plaintiff's alleged expectation that the deductible would be calculated against $7.4 million is potentially relevant to its reasonable expectations argument, addressed below. But the Policy, by its plain terms, says that the deductible will be calculated against the Statement of Values or, if none exists, the value of the property at the time of the loss. The Policy does not fail to adequately communicate this—it says it in plain terms. Nor is following the Policy an after-the-fact reduction in coverage.[10]

Whether Defendant followed the Policy turns on a narrower question about "reconstruction" versus "replacement" cost, to which the Court now turns.

3. Replacement Cost and Reconstruction Cost

In Part II.C.1, above, the Court described how Defendant used the Commercial Express tool to derive a value that Mr. Kopperud (Defendant's expert, who is knowledgeable about Commercial Express and CoreLogic's other valuation tools)

---

[10] The Court is not convinced that the above-quoted reduction-in-coverage statute applies to situations like these, but the Court need not rule on that either way. If Defendant calculated the property valuation contrary to the Policy, Defendant breached the Policy, full stop. There is no need to inquire whether this also qualifies as an unannounced reduction in coverage.

referred to as "reconstruction cost."  Plaintiff treats this as another breach because the Policy says "replacement cost," not "reconstruction cost."  (ECF No. 67 at 8–9, ¶¶ 39–41; *id.* at 9; ECF No. 71 at 21–23; ECF No. 84 at 15–16.)

Mr. Kopperud made clear that "reconstruction cost" is a term coined by CoreLogic, as distinct from "replacement cost, new," which is also an internal CoreLogic phrase.  Thus, the fact that Defendant calculated a value that CoreLogic would refer to as "reconstruction cost" does not mean that the resulting value is something other than what the Policy calls "replacement cost."  Plaintiff simply assumes, without analysis, that they cannot be the same thing.[11]

If Mr. Kopperud's testimony raises any question of contract liability, it is whether CoreLogic's "reconstruction cost" equals the Policy's "replacement cost."  But Plaintiff does not ask this question.  In particular, Plaintiff nowhere argues that Mr. Kopperud's description of "reconstruction cost" (the cost to rebuild, accounting for the loss of economies of scale and similar problems unique to rebuilding) is incongruous with the Policy's definition of "replacement cost" ("[t]he amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured," ECF No. 83-3 at 3).

Plaintiff instead makes different arguments.  Plaintiff contends that the Policy nowhere specifies that "value would be calculated using CoreLogic's proprietary software."  (ECF No. 71 at 22–23.)  True, the Policy does not specify any particular tool

---

[11] Plaintiff's expert, Mr. McCloud, does likewise.  (*See* ECF No. 67-11 at 5–7.) Mr. McCloud also uncritically accepts Plaintiff's position that the declarations page establishes the blanket limit as the predetermined replacement cost.  (*Id.* at 5.)

for calculating value, nor does the Policy hint that a tool will be used.  But surely Plaintiff does not mean to say that Defendant must simply guess.  If Plaintiff means to say that the Policy's failure to specify a valuation tool means that the blanket limit on the declarations page must therefore be the value, the Court rejects this argument for the reasons already stated in Part III.A.1, above—the Policy provides zero reason to suspect that blanket limit is also the predetermined replacement cost.

Plaintiff also argues that the Commercial Express tool adds overhead and profit, which would not have been added if Defendant had used a different software tool that Plaintiff calls "Marshall & Swift valuation."  (*Id.* at 22.)  This argument is inconsistent with Plaintiff's more general complaint that the Policy does not specify a software tool.  It is also somewhat ironic because the Marshall & Swift valuation tool is, like Commercial Express, "CoreLogic's proprietary software."  (ECF No. 71 at 23; *cf.* ECF No. 69-9 at 6–7.)  Regardless, Plaintiff nowhere argues that "replacement cost" according to the Policy ("[t]he amount you actually spend to repair, rebuild or reconstruct the building . . .", ECF No. 83-3 at 3) must exclude overhead and profit.  Plaintiff simply declares that Commercial Express includes overhead and profit, as if that is self-evidently impermissible.  It is not.

For these reasons, Plaintiff is not entitled to summary judgment under theory that Defendant breached the Policy by using Commercial Express to develop a "reconstruction cost" value.

###### 4.    Reasonable Expectations

Interwoven through Plaintiff's other arguments are references to the reasonable expectations doctrine.  (*See* ECF Nos. 67 at 12–13.)  By themselves, these passing references might not be enough to preserve the argument, but Plaintiff raises it directly

in its response to Defendant's summary judgment motion (ECF No. 71 at 23–24), and

Defendant addresses it both in its response to Plaintiff's motion (ECF No. 69 at 15) and

its reply in support of its own motion (ECF No. 83 at 13).  The Court will therefore

address the reasonable expectations argument on its merits.

The Colorado Supreme Court has summarized the reasonable expectations

doctrine as follows:

> Given insurance policies' unique nature, which includes
> significant potential for insurers to take advantage of or
> mislead insureds, such policies are subject to heightened
> scrutiny, including the doctrine of reasonable expectations,
> which obligates insurers to clearly and adequately convey
> coverage-limiting provisions to insureds.  In Colorado, the
> reasonable expectations of insureds have succeeded over
> exclusionary policy language in two main situations:
> (1) where an ordinary, objectively reasonable person would,
> based on the language of the policy, fail to understand that
> he or she is not entitled to the coverage at issue; and
> (2) where, because of circumstances attributable to an
> insurer, an ordinary, objectively reasonable person would be
> deceived into believing that he or she is entitled to coverage,
> while the insurer would maintain otherwise.

*Bailey*, 255 P.3d at 1048–49.

In terms of explicit arguments, Plaintiff only ever invokes "the first prong" of the

reasonable expectations doctrine "in that the term value could mean a variety of things."

(ECF No. 71 at 24.)  This argument is theoretically viable despite the Court's rulings

above regarding ambiguity because "[t]his manifestation of the doctrine of reasonable

expectations applies when policy coverage-provisions may not be ambiguous in a

technical sense, and hence subject to the rule that ambiguities must be construed

against the drafter, but are ambiguous from the perspective of an ordinary reader."

*Bailey*, 255 P.3d at 1050.  In other words, there may exist "ordinary reader" ambiguity

even in the absence of "technical" ambiguity.

But Plaintiff never elaborates on this distinction.  To the contrary, Plaintiff says that "[t]he reasonable expectation of Plaintiff and Buckner was that the policy insured the property with a value of approximately $7.4 million."  (ECF No. 71 at 24.)  Surely the principals and employees at Buckner (an insurance agency) are not the "ordinary reader," and it is not clear whether Plaintiff should be considered one either.  Moreover, an argument about an expectation of a certain value seems to fall under the second "reasonable expectations" prong, where circumstances attributable to the insurer create expectations of coverage.  Plaintiff develops arguments in that direction elsewhere, emphasizing that Mr. Thome's goal when working on the first iteration of the Policy was to come up with insurance limits that approximated the property's value, and that Mr. Thome used a software tool made available to him by Defendant to estimate that value, which (accounting for yearly 3% increases) turned out to be too low only three months after the Policy went into effect.  (ECF No. 67 at 5, ¶¶ 9–15; ECF No. 71 at 22.)

It is unclear whether Plaintiff may attribute Mr. Thome's motivations to itself for purposes of establishing reasonable expectations.[12]  But Defendant makes no argument in this regard.  Defendant instead argues that Plaintiff has failed to carry its summary judgment burden to establish a lack of a genuine issue of material fact about its reasonable expectations.  (ECF No. 69 at 16–17.)  On this, Defendant points to the 2018 renewal policy (Plaintiff continued to do business with Defendant despite their disagreements), in which Plaintiff agreed to an approximately $2.1 million increase to the blanket limit (*id.* at 10, ¶¶ 15–17), thus casting doubt on whether the 2017 property valuation and deductible actually surprised Plaintiff (*id.* at 16–17).  Defendant says there

_____

[12] Plaintiff elsewhere argues that Mr. Thome must be considered Defendant's agent. (*See* ECF No. 67 at 2; ECF No. 84 at 2, row 3, col. 3.)

also remains a material factual dispute as to how Plaintiff "expected the deductible to be calculated in situations where the entire property was not damaged" (*id.* at 17), referring to the building-by-building calculation example noted in the discussion of ambiguity, above.

The Court agrees with Defendant that Plaintiff has failed to carry its summary judgment burden as to its reasonable expectations theory or theories, both for the reasons stated by Defendant and due to the dispute over what role Mr. Thome played when entering the data that yielded the insurable value calculation (*see* Part II.A, above). Thus, it remains for the jury to resolve whether Plaintiff had a reasonable expectation, due to circumstances attributable to Defendant, that the deductible would be no higher than 2% of the blanket limit.[13]

\* \* \*

Strictly speaking, more than just reasonable expectations remains for the jury. Because Defendant did not move for summary judgment against any breach of contract theory, the most the Court can say in this procedural posture is that Plaintiff is not entitled to summary judgment in its favor on its contract theories—meaning that all of Plaintiff's contract theories remain for trial. However, Plaintiff's contract theories addressed in Parts III.A.1–.3, above, appear to be matters for the Court to decide as a matter of law. *See, e.g., Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of*

---

[13] From some perspectives, it would appear that the reasonable expectations doctrine raises only questions of law for the court to decide. *See Domokos v. Shelter Mut. Ins. Co.*, ___ F. Supp. 3d ___, ___, 2019 WL 4645430, at *7 (D. Colo. Sept. 24, 2019). However, the Tenth Circuit has endorsed the possibility of a jury trial to resolve a reasonable expectations question. *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1290 (10th Cir. 2006). In any event, Defendant does not argue that a jury *cannot* decide this question.

*Aviation*, 9 P.3d 373, 376 (Colo. 2000) ("contract interpretation is a question of law").[14] Likewise, Plaintiff's reasonable expectations theory based on the alleged ambiguity of "value" likewise appears to stand or fall on a question of law.  It thus appears that summary judgment is appropriate against Plaintiff on these theories.  Pursuant to Rule 56(f), the Court will order Plaintiff to address why summary judgment should not enter on those theories, leaving for trial—as it relates to the deductible—only the reasonable expectations theory based on Plaintiff's alleged intent at the inception of the Policy and the use of Defendant's tool to calculate the number that became the blanket limit.

## B.    Unreasonable Denial of the Deductible Difference

Colorado Revised Statute § 10-3-1116(1) permits an insured "whose claim for payment of benefits has been unreasonably delayed or denied" to bring an action against his or her insurer "to recover reasonable attorney fees and court costs and two times the covered benefit."  This claim has two elements: (1) the insurer delayed or denied payment to the insured of a covered benefit; and (2) the insurer's delay or denial lacked a reasonable basis.  *See* Colo. Jury Instr., Civil 25:4 (4th ed., July 2019 update).

As to the calculation of the property value (and resulting deductible), Plaintiff argues that it deserves summary judgment because ambiguities "should be interpreted in favor of the insured," but Defendant supposedly did "the opposite" when calculating the value, thus leading to an improper deductible.  (ECF No. 67 at 12–13.)  The Court will assume, without deciding, that an insurance company has a duty to judge for itself whether language in its own policy is ambiguous and to then construe that language in the insured's favor.  Even assuming as much, Plaintiff has failed to demonstrate any

---

[14] No party claims that something other than Colorado law governs the Policy.

ambiguity for the reasons already stated above.  Plaintiff therefore is not entitled to summary judgment in its favor.

As for Defendant's motion, it argues that it calculated the property value (and, in turn, the deductible) according to the Policy in August 2017, communicated those calculations to Plaintiff also in August 2017, and first learned that Plaintiff disagreed with those calculations when Plaintiff filed this lawsuit in February 2018.  (ECF No. 66 at 14–15.)  Although not stated in so many words, the Defendant's argument is essentially a rhetorical question: "What else were we supposed to do?"

Plaintiff's entire response is as follows:

> Unreasonable conduct includes compelling the policyholder to file suit.  Here, Defendant came up with an unjustifiable value based upon a secret calculation.  This calculation resulted in a 27% increase in the value of the property (20% overhead and profit and 7% architectural fees) claimed by the Defendant after loss.  Plaintiff complained to [Mr. Thome] and [Mr. Thome] discussed the issue with Defendant.

(ECF No. 71 at 24 (citations omitted).)  The Court is not persuaded.

First, nothing in the record supports Plaintiff's claim that Defendant compelled Plaintiff to file suit.  Prior to this lawsuit, Plaintiff never complained to Defendant that Defendant's valuation was inaccurate.  Plaintiff's statement that it "complained to [Mr. Thome] and [Mr. Thome] discussed the issue with Defendant" simply mischaracterizes the evidence.  (*See* Part II.C.2 & n.4, above.)  Perhaps an insurance company can quote a property value so high, or offer a settlement so low, etc., that the offer alone immediately and reasonably implies a careless, "go ahead and sue me" attitude.  No reasonable jury could find as much in this case.

Second, Plaintiff has failed to explain why Defendant's valuation is "unjustifiable." Plaintiff simply declares as much, as if the epithet alone substitutes for argument.  It

does not.

Third, Defendant's calculation was not "secret."  Defendant disclosed its

calculation in August 2017.  If Plaintiff means to say that the formulas and assumptions

used in the Commercial Express tool are secret, Plaintiff nonetheless fails to show any

triable issue of reasonableness in this regard.  Plaintiff never asked Defendant to

explain how it reached the valuation figure.  Plaintiff has learned through this lawsuit

how Commercial Express works.  Nothing in the record shows that Defendant would

have refused to answer Plaintiff's questions on this topic before Plaintiff filed suit.

Fourth, as already noted above (Part III.A.3), Plaintiff offers no argument why

overhead and profit are not properly included within the Policy's definition of

"replacement cost."

Finally, Plaintiff's theory of what Defendant supposedly *should* have done—

calculate the deductible as 2% of the blanket limit (ECF No. 67 at 13)—is not an

obvious alternative.  It is not clear how an insurer would have ever known that this, of all

things, is what would make its conduct reasonable.

In sum, Plaintiff lacks evidence from which a reasonable jury could find that

Defendant's valuation calculation resulted in an unreasonable denial of insurance

benefits.  Defendant is entitled to summary judgment on this issue.[15]

---

[15] This disposition frees the Court from needing to decide a more weighty issue.  As
previously discussed, it appears that Plaintiff's only theory by which it might recover the
difference between Defendant's deductible calculation and Plaintiff's calculation is breach of
contract, by way of the reasonable expectations doctrine.  However, reasonable expectations
requires the insurance company to cover a loss that the insurance policy does not, by its terms,
cover—or in other words, no insured needs to invoke the reasonable expectations doctrine
when coverage already exists.  Reasonable expectations is a *judicial* tool of contract
construction used to *imply* coverage that would not otherwise exist.  In this light, can an insurer
ever be deemed to have unreasonably delayed or denied insurance coverage if the coverage
would not have existed but for a (much later) judicial ruling that the reasonable expectations
doctrine requires that coverage?  Stated slightly differently, must an insurance company judge

**C.    Unreasonable Delay/Denial Related to Repair Estimates**

Plaintiff argues that the following create a triable issue about whether Defendant behaved unreasonably as to the repair cost estimates:

- Defendant paid an additional $92,000 (approximately) in November 2017, instead of paying that amount as part of the August 2017 payment (ECF No. 71 at 23–26);

- Defendant disputed Plaintiff's contractor's claims that various items (like ice and water underlayment) are necessary (*id.* at 25);

- Mr. Condie, at Defendant's direction, used a May 2017 price list to come up with repair cost estimates in November 2017 (*id.* at 26).

Plaintiff also asserts a theory based on Defendant's hiring of Dynamic for a second opinion, which the Court will address separately below.

Defendant argues that this evidence amounts to nothing more than a "fairly debatable" claim, and so Defendant did not behave unreasonably.  (ECF No. 66 at 9–14.)  Defendant relies on case law discussing common law bad faith (which Plaintiff does not assert) for the notion that a "fairly debatable" claim prevents a finding of statutory unreasonable delay or denial.  (*Id.* at 9–11.)

The case law is clear that, even in the common law context, "fair debatability is not a threshold inquiry that is outcome determinative as a matter of law." *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1218 (Colo. App. 2010).  This principle holds true in the statutory context: "if a reasonable person would find that the insurer's justification for denying or delaying payment of a claim was 'fairly debatable,' this

for itself what coverages do *not* exist in its policy but *should be deemed to exist* due to the reasonable expectations doctrine?  These questions, thankfully, may be left for another day.

weighs against a finding that the insurer acted unreasonably," but it is not "outcome determinative." *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 759–60 (Colo. App. 2012) (internal quotation marks omitted).

Surprisingly, Plaintiff nowhere disputes Defendant's reliance on the "fairly debatable" standard. (*See* ECF No. 71 at 24–29.) But the Court need not deem Plaintiff to have conceded Defendant's statement of the law (if incorrect statements of the law may be conceded in the first place), because the Court agrees with Defendant's broader argument that Plaintiff does not have sufficient evidence to convince a reasonable jury that Defendant acted unreasonably.

Defendant paid what it believed it owed (approximately $478,000) promptly after inspecting the property in August 2017. Its first inkling that Plaintiff expected a few hundred thousand dollars more came in mid-September 2017. Until approximately the end of October, Defendant's representative (Mr. Condie) and Plaintiff's contractor went back and forth on various line items. In November 2017, Defendant obtained a new estimate from Dynamic, but—in Plaintiff's own words—"Dynamic['s estimate] was too low for even Defendant to accept." (ECF No. 71 at 28.) Mr. Condie then revised his initial estimate, prompting Defendant to issue a second payment of approximately $92,000 in late November 2017. Defendant and Plaintiff discussed the November 2017 estimate in January and February 2018, and Defendant eventually announced that it considered the claim closed because Dynamic was willing to perform the repairs for the amounts Defendant had already paid to Plaintiff. Plaintiff filed suit that same day.

Plaintiff's only evidence that Defendant's conduct was unreasonable consists of conclusory assertions by its expert that the conduct was unreasonable. (*See* ECF No.

71-19 at 30–44.)[16]  Plaintiff has failed to show that it has evidence from which it could persuade a jury that Defendant's conduct was anything other than normal back-and-forth negotiation and good faith difference of opinion.  Plaintiff may still argue, by way of breach of contract, that the Policy requires the extra repairs (and associated payments) claimed by Plaintiff's contractor.  But Defendant is entitled to summary judgment to the extent Plaintiff labels Defendant's disagreement an unreasonable delay or denial of covered benefits.

**D.     Unreasonable Delay/Denial Related to Dynamic**

Regarding Defendant's use of Dynamic as a second opinion, Plaintiff theorizes, "It appears the game plan was to make it difficult for Plaintiff to use its own contractor and get Plaintiff to accept an unreasonably low number."  (ECF No. 71 at 28.)  Plaintiff links this claim to Colorado Revised Statute § 10-4-120(2)(a), which states, "An insurer or its agent that issues or renews a policy that insures real or personal property shall not * * * [d]irectly or indirectly require that appraisals or repairs to the property be made or not be made by a specified repair business . . . ."

This argument is largely incoherent.  Plaintiff admits that "Dynamic['s estimate] was too low for even Defendant to accept."  (ECF No. 71 at 28.)  So, whatever Defendant's intent, it did not use Dynamic's estimate.  And Plaintiff submits no evidence that Defendant's supposed pressure to use Dynamic caused Plaintiff to act or fail to act in any way that matters to this case.

Moreover, the predicate for an unreasonable delay/denial claim is a "covered benefit."  Colo. Rev. Stat. § 10-3-1116(1).  When Defendant told Plaintiff that it

---

[16] Many of the expert's arguments simply parrot arguments of counsel regarding, *e.g.*, the significance of the insurance limits on the declarations page.

considered the claim closed because it had a contractor (Dynamic) prepared to do the job for the cost of the November 2017 estimate, Defendant had already paid to Plaintiff the entire amount owed under the November 2017 estimate. Thus, the only covered benefit that might relate to this theory regarding Dynamic is the extra amounts that Plaintiff believes it should be paid under its contractor's estimate. Those amounts are either owed or they are not, and Plaintiff may pursue them under a breach of contract theory. But the Court has already ruled that Defendant did not unreasonably dispute those amounts. Defendant's intent with regard to Dynamic is therefore irrelevant.

Finally, there is the matter of the potential undocumented agreement in December 2017 for Defendant to pay Dynamic $571,000 (more than the November 2017 repair estimate) to perform the repairs. (*See* Part II.C.4, above.) The Court is not sure what Plaintiff means to make of this. Plaintiff argues, "In hindsight, there was either a secret verbal deal or there was a miscommunication and no agreement. It is unreasonable for an insurer to make agreements involving this amount of money verbally." (ECF No. 71 at 26–27.) But Plaintiff cannot simply declare something "unreasonable" and consider the argument complete. Plaintiff must connect this allegedly unreasonable behavior to the denial of a covered benefit. Plaintiff never does.

For all these reasons, the Court finds that a reasonable jury could not find in Plaintiff's favor on Plaintiff's unreasonable delay/denial claim as it relates to Defendant's relationship with Dynamic.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Defendant's Motion for Partial Summary Judgment (ECF No. 66) is GRANTED;

2.    Plaintiff's Motion for Summary Judgment (ECF No. 67) is DENIED;

3.    Defendant's Motion to Exclude Expert Testimony (ECF No. 95) is DENIED AS MOOT;

4.    Plaintiff's Motion Under F.R.E. 702 (ECF No. 96) is DENIED AS MOOT;

5.    As to Plaintiff's breach of contract theories, this matter REMAINS SET for a Final Trial Preparation Conference on January 31, 2020 at 2:00 PM, and a six-day jury trial beginning on February 18, 2020 at 8:30 AM, both in Courtroom A801; and

6.    Pursuant to Federal Rule of Civil Procedure 56(f), the Court hereby gives notice to Plaintiff that it is considering granting summary judgment against Plaintiff on all of Plaintiff's breach of contract theories related to calculation of the deductible, except for Plaintiff's theory that it had a reasonable expectation, due to its intentions at the inception of the policy and the use of Defendant's calculation tool, of a deductible no higher than 2% of the blanket limit.  Plaintiff is accordingly ORDERED TO SHOW CAUSE, no later than **January 14, 2020** why summary judgment should not enter to that extent.

Dated this 31st day of December, 2019.

BY THE COURT:

William J. Martínez
United States District Judge